Please take your time in switching up at the table. Please take your time in switching up at the table. Ready to proceed? Yes, now Aaron. I'm Griffin Sykes. I represent the plaintiff in this case, Chanda Callaway. Ms. Callaway is seated here behind me. Ms. Callaway is a civil engineer. She is the regional manager for the Alabama Department of Transportation and is the plaintiff in this case. She raised the man who died in this case after his mother died. She's the plaintiff here. Your Honor, this is a wrongful death case involving a police shooting of his neighbor. The case is unusual from several, several standpoints. Some of them I've addressed in the brief. There is seldom the kind of circumstances that are present in police shooting cases that were present here. Usually the policeman has no idea of who he's dealing with. Never seen the person before this case. That was not the case. He knew he had known Channing Spivey, the young man who died. He had known him most of all of his life. Is there any evidence in the record that he had known him in this state of condition? He knew that he had had brain surgery, recent brain surgery, and knew that he was undergoing chemotherapy. But did he know he was acting bizarrely and violently and so forth? No, sir. There was no evidence of that. This is the only instance that I know of in the record where he had acted like this. It was speculated that he had gone off his medications. But, again, this was a casual scene. I saw that in your brief. I'm just having a hard time connecting he had known him so long with the facts of this case, given the fact that he had known him to behave like this. Exactly. You know, even the best people can perform really, that's the brain disorder. The tumor alone can make you crazy. Well, I think that was the case. Well, Channing Spivey had just had brain surgery like a month or so before this. I understand, but we're talking about Adcock's frame of mind. Yes, sir. Because he's the shooter. Right. I don't understand what things he didn't know about Channing's behavior. He had known Channing since Channing was a teenager for 10 or 12 years or so. He had known Channing because Channing worked part-time. Channing was in high school. I understand, but so what? He could have been a deacon in the church. And if his story, the defendant's story, is to be believed, he had a right to take some action regardless of how long he had known the decedent. Right. We don't disagree with that, Your Honor. It is just an unusual circumstance. Usually, a police shooter doesn't know who he's dealing with. Mr. Sykes, we need to get to the issue. Let me ask you this. Sure. This is not a final position, but if the test, and, of course, we all know how the testimony is used in summary judgment, but if the testimony of Adcock and Penny is ultimately believed by a fact finder, you lose. Right? No, sir. I don't think so. Well, they say he was attacked. With his bare hands, yes, and with three able-bodied men. I understand your argument, but your best case is the testimony of Wesley Spivey and Robinson, right? Yes, sir. Okay. And your bottom line core argument, which kind of gets diluted with some other arguments, is that you've got to believe the best case that there's testimony for, for the plaintiff, because the plaintiff lost on summary judgment. Exactly. And then what they testified to, and I wasn't clear about this until I read all the testimony, but your two witnesses testified to, they saw him standing there. It's either five yards, ten yards, whatever apart, and that the decedent moved his foot towards the defendant, and the defendant shot him. Yes. And there was no struggle or no fight as of that time. The time they were out of vision was separated by a period of time when they were there and could see what was going on. So your argument is he either shot him without being hit, or he was hit and waited and they somehow divided and then he shot him. Isn't that your position? I don't know about the second half. I'm not exactly certain there. But, Your Honor, and forgive me, I want to get to the key point, and what I believe is that the court, the district court, applied the wrong standard for use of deadly force. Tennessee v. Garner, as Your Honors know, that's . . . That's the fleeing felon. We've said over and over and over again that if a law enforcement officer is in danger of serious injury or deadly force threatened by a perpetrator, he doesn't have to be fleeing. Garner doesn't apply. Your Honor, I'll quote from . . . Again, I'm looking at Teal v. Lozado. The use of deadly force is reasonable only if the suspect poses a significant threat of death or serious physical injury to the officer or others. I thought that was what I just said. Yes, sir. It is. Excuse me. I'm sorry, Your Honor. That's not Garner. Garner is about fleeing felons. We have other cases. It doesn't matter. Let's don't argue about . . . I think we can agree that if he wasn't under the threat of serious injury or deadly force, and there wasn't a fleeing felon, then he can't use deadly force. Isn't that right? Yes, sir, and he did use deadly force. I understand. I don't understand all the other peripheral arguments is what I'm saying. I'm sorry. I misunderstood the point. Your Honor, what we have here is the court used the more general lenient standard set out in Graham v. Connor for general use of force. And this applies whether he's using a baton, whether he's using mace, whether he's using whatever the policeman is using. That's the standard that governs general use of force. There is a special category, again, I think, that Tennessee v. Garner addresses, and that is the use of deadly force. And this court has held the cases Greer v. Ivey. It's quoted in my brief. It says this court reversed a district court that in submitting the case to the jury, the district court charged the jury only with regard to the use of force as elements in Graham v. Connor. And this court reversed holding that the court held that in deadly force cases, Garner's more exacting standard is necessary. So let's assume that we agree with you about what the standard is. What's your description of how the evidence does not meet that standard? I'll take it under both of those standards, if Your Honor wishes. Just the deadly force standard. Okay. Garner requires to use deadly force. It requires that there be a significant threat of serious bodily injury or death. And this court has questioned in a prior case about whether bare hands, which is all that Channing had to use against the policeman here, Adcock, bare hands, there's a question of whether that can ever amount to a significant threat. We've never held it can't. I'm not sure you need to go there. Somebody can be beat to death by somebody's bare hands. That can happen. But again, Your Honor, we have the testimony from Mason Adcock himself that bare hands don't pose a threat of serious bodily injury or death because that is a significant risk of it. Because to be significant, to be a significant risk, it can't be an uncommon or rare circumstance that use of hands results in that type of injury. He admitted, Mason Adcock, in his deposition, we've quoted it throughout the brief, Mason Adcock admitted that that's rare, uncommon, that an assault with bare hands results in serious bodily injury or death. That's not usual. And that's what significant means is that there's got to be a – this has got to be something that is not rare or uncommon. Is it unusual to be – it seems like the record reflects unfazed by a taser. Would you say that's unusual? Well, again, you also go – Mason Adcock had no idea about what all went down at the house that Spivey lived in. The law is just crystal clear that it is only information that the shooter, in this case, had at the time he fired that he can take into account in assessing what sort of risk he poses. Can you cite us a case where there's a holding? I'm not talking about language. I'm talking about a holding where the common knowledge doctrine was rejected and it resulted in a loss for the law enforcement officer in a deadly force case. Wait a minute. I'm not following. The common knowledge. Yeah. Knowledge that is – common information doctrine. The knowledge that is known to one cop is imputed to another for Fourth Amendment probable cause reasons, right? And there's an argument about whether that applies in excessive force or not. Exactly. Okay. Can you cite us a case where this court has held that it doesn't apply in excessive force cases and it made a difference in that case? No, sir, because the court has never really looked at that question. We quoted the Second Circuit opinion. I understand. The issue in the Second Circuit opinion is just very good on that point. It says there are different issues. The imputed knowledge, first of all, beyond whether it can be applied, it usually is applied to determine whether there's probable cause for an arrest or a use of – not use of force, an arrest or possibly for use where it's an arrest. The imputed knowledge only applies in those circumstances. The Second Circuit has never held that imputed knowledge can be used to determine whether a police officer used excessive force or not. Or, to be fair, has never held it can't be. No, sir, it hasn't, but this court would be extending it to that. But beyond that, Your Honor, the imputed knowledge doctrine requires that there have been some communication, minimal communication between the two officers between whom the knowledge is imputed. Now, Mr. Sykes, you're overstating your case again. If it required there be communication, you wouldn't have to impute the knowledge. There's some language in one of the opinions, maybe two, that says communication was available, which I don't understand. I'm not familiar with the case, Your Honor. There are dozens of cases that hold that there must be minimal communication between the – What does that mean? Hey, Bob, how you doing? How late you working today? There must have been an opportunity for some of that information that was imputed to have been communicated. If they never communicated – Let me ask you this on the opportunity question. The tape, audio tape, 47, 48, 49 minutes where the lady's talking to the law enforcement officers. Whose woman employee was doing that? Was it the sheriff's department or the city, or did they have a joint dispatch? She's a dispatcher. Are you talking about the call that originated the EMTs going to the scene? Yeah, and the one where in the background you can hear Penny saying, don't, don't, don't, don't, don't, don't, et cetera. I think that's where it picked up on her open mic. Is that what you're – Sure. Right. Where was it going to? I don't know. It was recorded. It was a dispatcher, I suppose. All right. Whose dispatcher? I don't know. The EMTs or? All right. If that dispatcher was the dispatcher for both – we're talking about Verne, you know, the area. If that was the dispatcher for both the county and the city, then there was minimal communication. The minimal communication that has to occur is between the party that has the knowledge and the party to, in this case, Adcock. There was not any communication with Adcock. This was simply an open mic that could be heard by the dispatcher. The imputing of knowledge there, again, Adcock and Penny both testified they had never had any communication with each other prior to the shooting that day. Both of them testified that. That is absolutely clear. Again, there is a question about whether, again, the Eleventh Circuit has ever used the imputed knowledge doctrine to support use of deadly force. All of the case law that I found in this area about imputed knowledge, all of that case law goes to the question of whether there was probable cause for an arrest. Thank you. I think we've given you a good bit of time. We'll let you retain your rebuttal, though, since that was on us. Mr. Howard. Please report. Rick Howard for Mr. Adcock. Mason Adcock is entitled to qualified immunity for four reasons. First, the plaintiff admits the law is not clearly established. Second, there are five cases in the last eight years where... Wait, wait, wait. He admits what law is not clearly established? It was along the Pruitt v. Montgomery argument that he made earlier. If you refer to his opening brief on page Roman numeral 3, it's also document 17, page 5. That last paragraph says, This case presents the opportunity to answer the question this court posed but did not answer in Pruitt v. Montgomery. That's a 1985 case. It says, The question is whether probable cause to believe the suspect poses a serious physical threat to the person or the officer exists only where the officer is threatened with a weapon. If that argument is correct, and this question has been out there for 35 years, the law is not clearly established. The second reason Mr. Adcock is entitled to qualified immunity is there's five cases in the last eight years exactly on point with the case that we have here, where a police officer is involved with a dangerous, noncompliant, advancing individual. Third, we have the facts of this case. How many of those are published? Proctor v. Gordon. Who? Proctor v. Gordon. Yeah, yeah, yeah. That was a tax account. Right. The facts of this case, Mr. Adcock is at his house, off duty, watching television with his family just before going to bed. He learns from Zanna Bloodsworth that there's somebody going to shoot somebody. She doesn't say who is going to get shot, and she doesn't say who is doing the shooting. Mason tells his family to stay put, and he goes out there and tries to figure out what in the world is going on. He rounds the corner of his house, and he sees this large man running up his driveway directly at him covered in blood. This bloody covered man is chasing an armed law enforcement officer that's screaming for help. They get to the house, and the armed law enforcement officer points his weapon at Mr. Spivey. It says, got to shoot him, and it says, shoot. At some point, Mason Adcock gets started. Mr. Spivey's pounding him in the head. Deputy Penney calls these blows to the head haymakers. Mason thought he was going to lose consciousness, and if he did, Mr. Spivey, who is by all accounts uncontrollable, would have access to his weapon, and he's got access to his family. Mason was his family's last line of defense. The fourth reason is Tennessee v. Garner does not support reversal. Tennessee v. Garner supplies a broad general framework to analyze the use of force cases, but here, the facts of this case are directly opposite of Tennessee v. Garner. Tennessee v. Garner was someone trying to get away from the police officers. That's exactly opposite of what we have here. By every account, Mr. Spivey was trying to attack everyone that he came in contact with. There's two things in the record that I would like to draw your attention to. First is the ALEA, and this is the old ABI organization, Alabama Law Enforcement Agency. They investigated this matter, and those four investigators came to the conclusion that Mason Adcock's actions were reasonable and justified. That doesn't really ... That's unprecedented. That's correct. The second thing I would like to draw your attention to is exactly what you discussed before. It's the audio. Starting at the 15-minute mark. I bet you you know. Is that audio county, city, or just county, or whoever happens to listen, or what? That is both the city and the county, and it's covered by a 9-1-1 board. It's the same dispatcher that sent the EMTs, that sent Deputy Penney out there. Yes, Your Honor. For both county and city. Yes. Now, is that in the record? I don't believe it's in the record that it's the same dispatcher. You can listen to the audio, and that dispatcher is talking to the EMTs because they call and get to a specific location, and then Deputy Penney is talking to the same dispatcher when he's asking for directions to get to the Spivey house. Yes, but I don't know that the EMTs are county as opposed to city. I see this a lot. It's not in the record because everybody knows it, but we don't know it. Your Honor, there's nothing in the record that indicates whether the dispatcher is county or city. Okay. Or both. Or both. See, if it was both, there's your lines of communication. That language is very loose in some of the opinions. Yes, Your Honor. I understand what you're saying, but it is for both. Let me go to what I consider the heart of his argument. I'm not arguing with him about it, but it seems to me that he's got two witnesses and you've got two witnesses as to immediate action preceding the shooting. Now, you know the summary judgment standard probably by heart. I'm sure it's by heart. I've been hit with it a few times. I imagine. And have done some hitting with it. Okay. If Wesley Spivey and Jim Robinson's testimony is believed, then there was no fighting immediately preceding the shooting, was there? Could you repeat that question again? Yeah. I'll just refer to him shorthand. His two witnesses were Wesley and Justin Robinson. The brother and friend. Yes, Your Honor. If their testimony is to believe, which it must be under summary judgment rule, then there was no fight. Channing did not inflict any blows on the defendant. If their testimony is to be believed and there was no assault on Mason, qualified immunity still applies. Don't skip it. Take the if out. If that testimony is to be believed, then there was no assault. Yes, Your Honor. All right. So everything we're talking about from here on is there's no assault. Okay. Go. Mason Adcock is called by Tim White. Tim White's the EMT. He asks Mason, do you hear that ruckus from racket going on across the street? He also tells Mason Adcock that they have been dispatched to the Spivey house and they're waiting on law enforcement officers. He says they're staged at the graveyard. Mason knows that that's two football fields away from the Spivey house. The message to Mason Adcock is it's too dangerous for us to go to that house to get close to two football fields. The next thing Mason knows is someone's knocking on his door, and that's Zanna Bloodsworth. Zanna Bloodsworth is able to get away from the Spivey house. She comes to Mason's house and says, we need help. Somebody's shooting somebody. She doesn't say who's doing the shooting or who's going to get shot. Mason knows two things. He knows to get his gun and protect his family. He goes outside the back door, rounds the corner, and he sees Mr. Spivey coming up his driveway directly at him. He's covered in blood. He's chasing an armed law enforcement officer. Deputy Penney gets there, and he engages Mr. Spivey with his gun. Amazingly, Mason Adcock holsters his weapon and tries to take Mr. Spivey on with his hands. He could not get a grip on Mr. Spivey. This is contrary to what his two witnesses say. Don't fudge on me now. He knows there's an out-of-control man advancing on him. He moves five to ten yards from him, and his foot moves forward. That's what his witnesses say under oath. I hate that summary judgment rule for you, but I love it for him. Our position is they did not make it to Mason's house in time to see the accidents or see the fire. I understand, but that's for a jury to decide. They said they did. Like most favorable to the loser of the summary judgment motion. Yes, Your Honor. Mason Adcock was still in fear of his life when he shot. It's undisputed with those two witnesses that those two witnesses advanced at Mason. A reasonable officer seeing another officer engaging this man with a gun is going to know that something's wrong. Then he hears Deputy Penney say, Got to shoot him and shoot. He also hears Deputy Penney say, I can't do it. Deputy Penney testify that he couldn't do it because Mason's family was directly behind Mr. Spivey. I think a reasonable officer in that position is going to know whatever happened down there is bad. Mr. Spivey's covered in blood. I've got an officer here pointing a weapon at Mr. Spivey telling me to shoot. Shoot him dead? No, he said you got to shoot. I know. That's the point. I mean, we're talking about a situation that escalated into the death of an individual who was clearly going through something. You've got all these individuals around. Now you've got two cops at least on the scene even though Mr. Adcock was off duty. I'm just trying to understand how we jumped from securing Channing to make sure that he wasn't a danger to anyone or himself to his death. Your Honor, he placed Mason Adcock in a position where Mason feared for his life. It's on the audio. He felt that Mr. Spivey was trying to kill him. Even though he knew that he wasn't armed? And I see there's a lot of statistics that you put in your brief about the number of people who can still, and Judge Carr spoke to this, that hands can be a weapon. But in this case, I mean, in most instances, the weapon is an actual knife or a gun. In this case, there's no evidence that Channing was armed with anything except for his hands. Well, a foot or hand can apply deadly force. We know that. Here, Mason Adcock actually holstered his weapon and tried to do that. He tried to subdue Mr. Spivey with his hands. He couldn't get a grip because of all the blood. Now, I know that we're not talking about the assault, but still. Yeah, Your Honor. I mean, they said there was no touching. They were where they could have seen if there was any touching, and there wasn't any touching immediately prior to it. They were five to ten yards apart. Foot moved toward him. He shot him. I understand. Mason Adcock saw the other officer engage him with his weapon, and this other officer says, got to shoot him and shoot. I don't know what a reasonable officer would conclude from Deputy Penney's actions, other than what Mason thought that this was a dangerous situation and my life's at risk. And Penney was armed. Yes, Penney was armed with a gun and with a taser. Which had been to no avail. Correct. That's absolutely correct. He tried to tase him. He actually pulled the wires out of his body and ran and jumped on top of the ambulance. That's correct. But we don't have any evidence that Mr. Adcock knew that, right? Well, we don't have evidence that Mr. Adcock knew about the tasing or jumping on the ambulance. We do know or can believe that Mason knew that Mr. Spivey chased Mason or chased Deputy Penney all the way to his house because that's what he saw the tail end of that. The only thing that Mason didn't know was the tasing and probably shattering the windshield of the police car and probably... I thought it was the ambulance. Was it the police car? He jumped on the ambulance and shattered the police car? But when Deputy Penney first got there, Mr. Spivey went directly towards him to attack him, I guess. He starts swinging his arm. He broke out the windshield in the police car. That's when he was tased. He jerks the wires out. And then he goes and jumps on top of the ambulance and breaks the windshield out with the ambulance with his fist or with his face. The EMTs got glass in their eyes and they actually defended themselves. They put it in reverse, threw him in a ditch, and he survived that. And that's when he jumped up and started chasing Mr. or Deputy Penney all the way to Mason's house, a football field away. Now, maybe I misunderstood, but I had understood your brief to argue that perhaps the assault happened and his witnesses didn't see it, that their view was obstructed during that time period. Did I misunderstand something there? No, Your Honor. That's exactly what we argued. The guys, the brother and the friend, were at the Spivey house, and Mr. Spivey jumps on the ambulance, gets thrown in the ditch, and he chases Deputy Penney all the way to Mason's house. Now, that's a football field away. These guys testified that they did not leave the Spivey house until they lost sight of Mr. Spivey going around the corner running up to Mason's driveway. The amount of time that they missed in this whole situation, the amount of time that it would take them to cover a football field on foot, if you listen to the audio, this whole thing at Mason's house only lasted just over 30 seconds. They simply were not present there, and that conclusion is supported by their testimony. I asked these guys, what did you hear? What did you see? Justin Robinson said he didn't hear anything specific or didn't hear anything at all. Mr. Spivey says, well, Wesley Spivey said, I didn't hear anything specific. If you listen to that audio, you can specifically hear Mason Adcock giving command after command. You can specifically hear them communicating. The only time there's a lull in communication is just before shots are fired. I asked these guys, what did you see when you got there? Remember, they had to run a football field. They got there, got behind the bush, and the first thing that they saw, and this was consistently, is they saw Mr. Spivey step in advance.  If you listen to the audio, figure out the distance there, they simply were not present to see the fight. I'm out of time. Mason Adcock respectfully requests this court to affirm Judge Mark's opinion. I'd like to clarify a couple of things. Before you do that, I want to make sure I know your position on one thing. Let's say that the audio indicates that if one overlays the audio with the testimony, I'm not asking you to admit that this is true here, but I'm saying in a case where that is true, is that still a decision where you would wait for the jury to decide that the audio shows that the testimony can't be true, or is that a call that this court can make? I think that's something that's got to be submitted to the jury, Your Honor. Again, you draw all inferences in favor of the non-movement. Not only all inferences, but you accept, as Judge Carnes has pointed out, you accept the version of the testimony that is most favorable to the non-movement. Let me point out, following up on that, I hadn't focused on that, but the Supreme Court said, Scott, if you've got a video, don't believe the witness, believe the video. That was years ago, and we don't know if it's still technologically sound, but that's what they said. Also, there is an exception to the light most favorable to the losing party on summary judgment for facts or testimonial evidence that can't be true. For example, if it was a hundred yards and the witness testified, I was there in three seconds, we would disregard that as summary judgment fodder, because it's just not physically possible. That, I think, is what we're talking about now. No, sir. I don't think there's anything, and what you're talking about here is not a video. You're talking about an audio, and there is nothing in the audio that is inconsistent with any of the story that my version of the facts might be. But doesn't the audio demonstrate how long the incident took? I think that some inferences can be drawn about that, but because you don't have a video, because you just have audio, you still are left with pauses that you don't know about. There are half-garbled words. There's a whole lot in that audio that you just can't make heads or tails of, and you can draw a lot of different inferences about it. The best testimony about this, we think, is the testimony from Penny. He said that it was less than a minute after Adcock came out of his house that he started firing. That's consistent with the other they all talk about. This happened in just a minute or so. This was something that Adcock took no time to reflect or look at or consider anything, and he had no information. He had no information other than what he observed there. There's one point I need to clear up also about Zanna Bloodsworth. She is the young lady that came up there and came to his door. What she did, she was afraid not that Channing was going to hurt or harm or kill anybody. He didn't have a weapon. What she was worried about was that Penny was going to kill her brother-in-law, that he was going to kill Channing. When she went to the door, she testified and also Adcock testified that what she said was not that somebody is shooting somebody. Nobody mentioned anything about shooting, or Zanna didn't mention anything about shooting up at Adcock's house. What she said, and it's in the record, she said, he's going to kill him. He's going to kill him. She was referring to that Penny was going to kill Channing. Penny was the only person with the ability to kill anybody there. He had the gun. Channing didn't have a gun. What Zanna was communicating was that Penny was going to kill Channing, not that Channing was going to kill anybody. That certainly is an inference. The indeterminate pronoun he's going to kill is what Channing says, what Zanna says that she told Adcock when she went to his door. So all of this about that Adcock had a reason to fear Channing, all he knew is there's something going on down there, some ruckus or whatever. And somebody had told him that somebody's going to kill somebody. He's going to kill somebody. Yes, right. And again, the only person that Zanna knew had the ability to kill anybody was Penny. He had the gun. That's who Zanna said she was talking about. She said she was referring to her fear was that Penny would kill. Steve, you're equating he's going to kill somebody with you've got to have a weapon. Well, I think the most logical thing when Zanna is stating that, it's not an absolute necessity that the person she's talking about had to have a weapon. But if she's talking about somebody going to kill somebody, is she talking about the person who has pulled a gun and drawn it and pointed at somebody? Or is she talking about the person that the gun is being pointed at? And who's been chasing an armed person fearlessly all the way up the drive. Chasing, I think, is an incorrect statement. What they said is that what was occurring was that Penny was backing up down this – they're 100 yards apart. There's a diagram there, a scale diagram of the driveway to Zanna's – to Adcock's house. And it shows where Spivey's house is on this roadway. There's about 100 yards between the two houses. And there's 50 yards then of, say, driveway where they turned in to go to Adcock's house. Well, the long and short about all of this, I suppose, about he's going to kill somebody is, again, these are Zanna's words. Who is it most reasonable that she is talking about when she's talking about he's going to kill somebody? Is she talking about the person with a gun in his hand? But that's not the question we're asking, right? Because even if I agree that there's no other way to read it from our perspective that that's what she meant, don't we have to look at what Officer Adcock could have understood about that, regardless of what she meant? You have to draw all inferences in favor of the non-movement. And if you want to draw the inference that that's what Adcock – you can draw that inference. But I think that's contrary to the court's – Don't you have to draw inferences that you have evidence for? I mean, I don't think we've got evidence that Adcock understood Zanna to be saying that she was afraid that Spivey would be the one who would be killed. Nor do you have evidence on the other side. I didn't see that. Was Adcock questioned about that? Was Adcock questioned about what? About what he understood? He's going to kill somebody. Who's he in the depositions? Zanna, I think, testified that that was her concern. I'm sorry. I'm talking about Adcock. No, sir. I don't think Adcock – Adcock said he was very surprised to see Channing when he showed up there. That doesn't mean that he – I realize. I agree. This is a horrific situation. I think we can all agree. Again, we think this is quite essentially what a jury ought to decide, the questions that you are posing. The fact that they are being posed so many questions about fact we think is an indicia that this is the kind of case exactly that summary judgment is ill-suited to, and this is the kind of case that should be decided by a jury. We ask that that be done. Thank you. Bye. We are in recess until tomorrow morning. Thank you. Bye.